Your Honors, the third case in the morning, call 209-274, Bell Land Improvement, Inc. v. Paquinelli, Inc. On behalf of the Alamog, Mr. Richard A. Pollard. On behalf of the FD, Mr. Jonathan P. Nisiali. Good morning, Mr. Chairman. Good morning. Good morning, counsel. Mr. Pollard. May it please the court, counsel, my name is Michael Pollard, and I represent the appellant Paquinelli, Inc., in this case. As the court, I'm sure, is aware, this matter comes before the court on appeal, basically, of two rulings in a complaint and a counterclaim. The first ruling is a grant of a motion for summary judgment on both the plaintiff's mechanics lien claim for approximately $60,000 in change, and on defendant's counterclaim, which seeks in excess of $700,000 for  the plaintiff's claim for $60,000 in change. There's an additional issue here about whether there's a proper interest calculation, I would indicate to the court that I don't intend to argue that. It's, I think, adequately addressed in the briefs, and if the court reverses as I hope will, there's no need to get there. So, if the court would indulge me, I'd like to take a look at each of the two separate rulings. The first one, the summary judgment. The second is a denial of a motion to reconsider. If I could look, if I could talk about them individually, starting first of all with the motion for summary judgment. If the court, of course, were to reverse the motion for summary judgment, it would have no need to address either the motion to reconsider or the interest calculation issue. And so what I would like to do is first of all look at the basis of the trial court's summary judgment ruling. This is from the transcript of October 15, 2008, when the trial court made its ruling. And then in light of that, I'd like to go back and talk about the evidence that existed that showed that there was a genuine issue of material fact. The court's ruling on October 15, 2008, was that the operative time frame, the time frame the court was going to look at, is not when the foundation in these homes started to crack, but it's when Bell Land completed its work under the project. Number one, time frame, not when the foundation started to crack, evidence about that, but about when Bell Land, the subcontractor here doing the earthwork, when it completed its work. Why would that be inaccurate? Or why? Well, because there's, first of all, there's evidence. What happens is they complete the work. There are some soil testing reports done before they complete their work that show that it's final. By someone that you, your clients had hired? Correct. Bell Land, the Hardy-McGlynn summary judgment. They do the earthwork. There are soil testing reports prepared by TSC before that that show 95% compaction. The houses are built. The houses sink. Everybody goes, what's wrong? They go back and take a look. And the soil testing reports show less than 95% compaction. And I'll talk a little bit more about what other evidence is, but it's all of that evidence that occurs after the houses sink that isn't considered. Well, that's the troubling issue. According to the facts of the case, TSC, that was hired by your client, did the testing. Apparently the compaction rate was 95%. In 2001, plaintiff completed the work and the site in September 2002. When does the obligation on the part of the plaintiff end, A? And, B, is there some warranty given by the plaintiff? I mean, at what point do you determine whether or not the plaintiff fulfilled their obligation? Okay, fair enough. Let's take a look at the contract. It's not a bad place to start. The contract covers, and you can find the contract, by the way, beginning of page 431 of the record. It contains in the, I'm sorry, it starts at page 428 of the record. This is what it looks like. Land development contract. In paragraph B, under the work, it says, Subcontractor shall perform and complete the work in a good workmanlike manner. So that's one of the gists of our complaint. Was this completed in a good workmanlike manner? I think that is judged as fairly after the work is completed as it is before it's completed. You don't dig a hole, fill it, and then when the house is built and it sinks and it's found not to be compacted to 95%, you're not entitled to say perform in a good workmanlike manner. Because I think that survives the building of the house. Well, that is some appeal from a logical standpoint. But again, without tying in to some type of a specific time frame, what if there's a problem and a snag with the builder and these houses aren't built until five or six years later and the compaction rate is subsequent tests indicate maybe it wasn't 95%? To the point, at what point do you determine performance? You're saying, well, you know, arbitrarily, well, you've got to wait until the houses are built. Is there anything in the contract that says? How long do you have to wait to determine if a plaintiff fulfilled their obligations? Well, it's good and workmanlike manner, but there's nothing in the contract that says the contrary either. You determine, for example, there are, in addition to the contract that I talked about, there are special provisions in the contract, an addendum. And it says right at the start, these are additional to the good and workmanlike manners. In paragraph two, it talks about undercuts. Undercut volumes should be filled with compacted clay from approved borrow pits as approved by soils engineer, meaning 95% modified proctor compaction per plans and specifications. Paragraph 29 says there shall be 95% compaction per modified proctor in roadway and pad fill areas. It wasn't determined that it was 95% compaction made by TSC's engineers. Wasn't that in effect at some point in the process determined to be a 95% compaction? At some time in some spots, it was determined to be that way when they left the job. Okay. You said it, and that's the question I have. At some time on some spots, were they to compact the whole site, or were they compacting certain whole footprints? They were to compact. They compacted the whole site. Okay. The fact, and there is some allegation that maybe after the compaction was completed, for whatever reason, the actual home sites changed slightly. Correct. Is that a significant intervening cause here that would affect Bell Land's obligations? No, Your Honor. I think all of that was debunked when we got the expert on the motion to reconsider. And that's why I'm trying to separate out what was presented to the judge on the motion for summary judgment, what was presented on the motion for reconsideration. So that was in the affidavit of our expert that debunked that motion, and that came on the motion to reconsider. And, of course, the question is, why didn't it come earlier? Well, because we didn't have an expert at that point in time. Discovery was still ongoing. In fact, on page 5 of our response brief to the motion for summary judgment, we indicated that discovery was still ongoing. I will say there was not a formal request for a continuance made. It's not in the paper. But the court was advised that discovery was ongoing. Depositions were heating up. And if I could just give you the timeline. Let me ask one other question before the timeline. Okay. And I want to make, in my own head, both of you sort of interchanged the concept of 95% compaction and then 95% modified proctor. Is there a difference? No. Okay. I was concerned about that because I couldn't find a definition for modified proctor. Well, I'm glad you were concerned about that, Your Honor, because I took about an hour preparing for this argument trying to figure out the answer to that question. Okay, good. I'm glad you asked it. Good. Well spent. Okay. All right. First of all, the timeline on the motion to vacate is that August 29th, the plaintiff filed the motion for summary judgment. The response filed by the defendant, I believe, was in late September. September 15th strikes me as a date, maybe September 21st. The expert was retained in late September. The trial court issued its decision. Here it is. September 22nd, Pasquinelli filed its response to the motion for summary judgment. Late September, Pasquinelli retains the expert. Under 191B, what do you have to say when you're talking about new evidence? You have to say who is in the possession of what the evidence is going to be. When we file that response, we don't have that because we don't have the expert's conclusions yet. October 3rd, 2008, Bell-Lanz files its reply. October 15th, 2008, the trial court grants plaintiff's motion for summary judgment. October 30th, 2008, Pasquinelli files its motion to reconsider, supported by an affidavit of the expert dated October 28th. So from the filing of the motion to summary judgment, which, by the way, was not pursuant to any Rule 218 Case Management Conference. There's nothing here about that. There's no discovery cutoff. There's no disclosure for experts. None of that was required. And so from August 29th, 2008, when Bell-Lanz files its motion for summary judgment, it's about a month and a half to the ruling. And within two months, that expert report is disclosed and motion for reconsideration filed. Still no expert discovery cutoff date, et cetera. So it is a very compacted period of time where a motion for summary judgment is filed in the middle of ongoing discovery. What do you do? I think, first of all, I think there was more than ample evidence to survive summary judgment on the material that was presented to the trial court. But secondly, on the motion to vacate, I think Pasquinelli acted extremely diligently and not in any way to delay the court. Well, the expert had been retained, though, prior to the court ruling on the motion for summary judgment, correct? Correct. So was it a strategic decision not to attempt to present an affidavit of the expert before the court ruled on summary judgment? I'm struggling to determine why that affidavit wasn't tendered while the court was considering the motion for summary judgment. He hadn't completed his work. I'm sorry? He was retained in late September. We didn't get the affidavit until late October. He hadn't completed the work. Okay. And then what about asking the court for continuance on this ruling? That is not done in the record. It's not done. The motion does say that discovery is ongoing. There is no indication in that record that the trial court would have denied that motion if there was a motion to continue. Is there? No, the trial court indicated that it would likely have granted a motion to continue. It said that on the motion to vacate. But let's talk about the motion. We'll move past it. We've talked a lot about the motion to vacate. Despite my effort to try to move past it. Let's do it the other way. We'll stay on the motion to vacate since we're interested in that. There seem to be really two lines of cases. And I'm kind of familiar with both of them because some of the cases the parties cite were cases that I either argued or that my firm participated in and they came in different ways. Kirk v. Michael Reese Appellate Court decision 1995 makes the proper point that motions to vacate are directed to the equity of the court. There aren't really statutes and rules about motions to reconsider. And Kirk v. Michael Reese says what you want to do as much as possible where fairness dictates it is to get to a result on the merits. That's the preferable course. And in that case, even though an expert was not disclosed, was not retained even until after summary judgment was entered, the court allowed it. It said we think fairness calls out for that here. So, A, I don't think anybody disputes that motions to reconsider are directed to the equitable powers of the court. In candor, I'll also say it's subject to an abuse of discretion standard. I don't deny that. I mean, it's part of the analysis. Gatlin v. Ruger decided by the Illinois Supreme Court in 1990 says that when you consider new evidence on a motion to vacate a summary judgment, you apply the same standard as you do on the initial summary judgment. That is, is there no issue, genuine, no genuine issue of material fact raised. I submit, and again, we've jumped to the motion to vacate. I didn't get a chance to describe the trial court's ruling. But the trial court's motion to vacate ruling basically was all of the information your expert relied on was available before. Therefore, it's not new. Therefore, I'm denying the motion to vacate. Well, a couple of things. The expert wasn't retained until, or the expert hadn't finished his work until after. So, I guess I'm supposed to. Well, go ahead and finish what you're talking about now. Okay. So, I think the equitable considerations are fair. This was newly discovered evidence. The motion to vacate should be granted. Because I don't think there was ever a decision, actually, that ever took any of this evidence that occurred after the event. None of it from our Anthony Pasquinelli at the summary judgment stage, the deposition testimony we offered of other witnesses, all about these soil tests. That was ignored by the court because the court stopped the timeline at the date they left the job. I think a good and workmanlike performance survives the completion of the work. And it means that houses don't fall. And here there's a loss. Now it's 60-some thousand, potentially 700 to remediate all these. This entity played a big role in that. They didn't perform in a good and workmanlike manner. I think more than ample evidence was adduced at the summary judgment hearing. And if not, the motion to vacate clearly should be granted. Thank you. You'll have time for rebuttal, counsel. Mr. Michelli. Justices, counsel, thank you. My name is Jonathan Michelli, and I have some brief arguments on behalf of Bell-Land in this case. The first thing I want to do is just clarify some of the comments made by opposing counsel that I think are not absolutely accurate when we talk about the timeline of the motions. In our case, Bell-Land's motion for summary judgment was filed on June 24 of 2008. Some four and a half years after the case had been filed initially. Thereafter, there was a court order entered on June 30, 2008, which set a briefing schedule but also directed that fact witnesses be produced for depositions in advance of Pasquinelli filing to reply. There were some depositions taken. Thereafter, Pasquinelli replied to the motion on September 22, 2008, four months after the motion was initially filed and after some depositions were taken. There was an oral argument in October then of 2008, and the motion was granted. So in that four-month time period, while being faced with the motion, Pasquinelli never decided to go get itself an expert. Despite the fact that the case was four and a half years old already, despite the fact that it had been prosecuting claims against Bell-Land and TSC based on this earthwork that was performed, and despite the fact that it was faced with a motion for summary judgment and about to get itself involved in a motion hearing, it just didn't decide that it needed an expert until probably preparing for the motion said, uh-oh, let's get ourselves an expert. But that certainly, that does not show diligence on the part of Pasquinelli with respect to its actions in presenting an expert. But in any event. Setting aside that issue for the moment, what is your understanding of when the issue of plaintiffs having fulfilled their contractual obligation is to be determined? What time is that supposed to be determined? The only time it can be determined is at the time that Bell-Land performed its work, which was in 2001. In fact, the contract with Bell-Land and Pasquinelli indicates that the material shall be installed in lifts and compacted to the satisfaction of the soils engineer. That's it. It's the satisfaction of the soils engineer on site. Bell-Land completed its work. It was paid. Most of the money it was owed, it left. It left the site. So there's nothing in the contract that would indicate that Bell's obligation continues after it leaves the site and after the tests are completed. Correct. Correct. So what does good and workmanlike manner refer to? The site as it's done or each lift as it's done pursuant to the engineer's, whatever, I can't remember which of the engineer's direction. Well, I think that in general the work performed by Bell-Land under its contract, according to the contract, needs to be performed in a good and workmanlike manner. If you read the contract and you hear the testimony, what we know is that Bell-Land's work at the site included moving earth around and compacting it. It did no testing of its own. Although this is what we call a quantification contract. In other words, it says you're going to compact to this 95% rate. But the 95% rate is determined by another party. That's specified in both Bell-Land's contract. That's specified in TSC's contract. And all the testimony in the case by the people at TSC and by Bell-Land is that, yes, TSC is the party that would do the testing and the verification. In fact, Pasquinelli's own third-party complaint against TSC alleges that it's TSC's responsibility to verify the compaction rates that Bell-Land, the soil at Bell-Land compacted. Did your client have anything to do with choosing TSC? No. Or was this strictly a Pasquinelli decision? In fact, the contract reads that there would be a soil engineer chosen and paid for by Pasquinelli. It's right in the contract that identifies TSC by name. Now, getting back to the workmanlike manner issue, what we've got in this case is the testimony of individuals, Brian Ziller and Michael Sullivan from Bell-Land. These are guys who are foremen and actual earth movers. Michael Sullivan did the compaction. And we've got the testimony of Mohammed Khan and Tom Morris of TSC. They're the soil engineers. Everybody agrees that the way the custom and the practice in the industry works is that the soil engineer does the testing, makes sure the compaction rate is met, gives the thumbs up, and the guys, the earth work movers, bring in more dirt, compact it, and move the earth around. And what we've also got is that the way that we say the contract worked, this three-part contract between Pasquinelli, Bell-Land, and then the contract with TSC, the way it all worked was the custom and practice in the industry. Brian Sullivan talked about how he's been doing this for 30 years. He's worked with TSC and Pasquinelli before. This is the way it always happened. This is the way we always did it. There's no testimony from anybody on Pasquinelli's side showing that this is not the way it works in the industry. They didn't bring in another excavator to say they're all out of their minds. In the industry, it really works this way, and this is the custom and practice, and this is good workmanship in the industry, and Bell-Land didn't need it here. Instead, they've given us an affidavit of Anthony Pasquinelli who says in 2003, there was settlement, so they didn't meet their contract, and they didn't do their work in a good and working way. Counsel, that's a logical point, but confining it to the motion for summary judgment, which, as you know, is considering the caseload to be a somewhat harsh remedy. Sure. Are there not two separate and distinct covenants in this contract? One is to compact the building paths to a 95% compact rate, and the other is to perform its work in a good and workmanlike manner. So the mere fact that the testing arguably verifies a 95% compaction rate, does that in and of itself determine, therefore, the plaintiff did the work in a good and workmanlike manner? Or is the good and workmanlike manner a side issue that could be subjected to a question of fact? Well, my response to that, I think, is this, is that whether it's all jumbled up as one or whether there are two separate and distinct covenants, there still is no question of fact. And the reason being is that, as Your Honor pointed out, TSC determined that the 95% compaction rate was met in 2001. Therefore, we met that aspect of the contract. If the good and workmanlike manner is some separate covenant, we've shown that that was met as well. And the reason we've shown that was met is that we've got the testimony of people in the industry from Belland. We've got the contract. The testimony is that we performed our contract the way we were supposed to. TSC says we're in the industry as well. We know that they did their work the way they were supposed to. Muhammad Khan, a gentleman from TSC who's a soils engineer who was out there on a daily basis, said, I watched Belland do their work. They did their work and their compaction the same way. I've observed every other contractor in the field do it. There was nothing incorrect about what they did. So we've got testimony from people in the industry, Brian Ziller, a 40-year veteran or 30-, 40-year veteran. We've got Sullivan, the guy who did the contract, and talking about his experience and how he performed his work and how it met the customer practice in the industry. And the individuals from TSC said the same thing. So we've got evidence to show that we met that burden. So in answer to your opponent's argument that there's an independent covenant, you're saying there's testimony and evidence that establishes that the Good Workmen Lake Covenant was met in this case? Absolutely. And there's no evidence. What there isn't is there's no evidence from Pasquinelli that shows that it wasn't met other than an affidavit from Anthony Pasquinelli at the summary judgment stage that says because they were soft soil, they didn't do their work right. All right. Let me ask you that. The defense counsel is sort of arguing what is sort of analogous, as opposed to sort of a res ipsa argument here, saying, well, you know, under the Good Workmen Lake Manor consideration, obviously the house is settled. Something went wrong. Isn't that a question of fact as to what went wrong and whether or not it's good in the Workmen Lake Manor? Because according to the facts as I read it, then the house is settled. What's your response to that? My response to that is that res ipsa is a negligence theory, not a breach of contract theory. And most of all, it is a means by which defense counsel is attempting to avoid having to provide evidence of two of the elements of its case, that being one breach and that being two proximate cause or damages caused by the breach. What I think the absence is that's glaring in all the affidavits that are being put forward in this case are that, just timeliness and timeline speaking, after Bell Land did its compaction, those building pans sat for about 16 months. In late 2002, Pasadena says, okay, after changing the design, we're going to now build these homes finally. So the first thing that has to be done is they dig the holes for the foundations because there are basements for these homes. Once the holes are built for these very homes that they claim are settling, TSC comes back. TSC gets in those holes and again, for a second time, tests the soil at the footing grade of these homes. And again, way after Bell Land is gone, approves them and says this soil is 95% compacted. It's good to go. And based on that, the foundations are poured, the houses are built, and then they settle. And lo and behold, it's not a 95% compaction. When is that particular, that's 2003? That's in the fall of 2002, the very first step to building these homes. When they set it, when they go back and say it's not 95%? March of 2003 is when it's first determined that there's some soil under there that's not compacted. And that's how long after they left the site? Yeah. The compaction work was performed by Bell Land in May through June of 2001. The digging of the foundations and secondary testing by TSC is in fall of 2002. The settlement occurs in early 2003 after the homes are complete. So about a year and a half later? About a year and a half later. Now, between the end of the compaction and 2002, Bell Land is on the site, but it's not compacting properties anymore. Part of its role, if you read the content, is that they come back later and they have to do some curb work. That's sort of the end of the project for them. Well, and I realize that that's not the issue here, but would we have some really big gophers go through? I don't know. You know what, Your Honor, it's a good question, but I don't know that it's one that I have the burden of proving or disproving. So you're saying that they should have presented some proof that something didn't happen possibly or something that could explain it didn't happen and they didn't do that? That would potentially be evidence of them not complying with that good and working life standard, which there is really just none of. Your Honors have no further questions, and I think that's what we have to deal with here with respect to the motion for summary judgment is that there was just no evidence presented by Pat Squinelli to show that there's a link. We have this soft soil, and we know because of this, this, or this admissible evidence that Bell Land didn't do its work right, and that's what's causing that soft soil, but we just did not have that. What they preferred was this affidavit of Anthony Pat Squinelli that in many respects doesn't comport with Supreme Court Rule 191. It's not on personal knowledge, and he just says, I was there in 2003, and I saw soft soil, which means that Bell Land didn't perform its work right. They also offered the testimony in this letter from Tom Morris, the president of TSC, which says that in 2003, again, I found soft soil, but the letter also goes on to say, I've looked at our soil reports, and in 2001, we confirmed that was a 95% compaction rate, and my opinion has not changed. He testified to this again, and I have no opinion why that soft soil was there in 2003. No opinion that had anything to do with Bell Land or anybody else on the site. I just don't know why it was there. So there's no evidence that it was any breach on the part of Bell Land that ultimately led to that soft soil being there. So I think that ultimately when Judge Wheaton determined that the relevant time period was 2001, she was absolutely right, and there was nothing making that connection between 2003 and 2001 that could have raised a question of fact. There simply was no question of fact about the breach, about the workmanlike manner of the work that was performed, and summary judgment was correctly decided. So is there a separate contract for the curbing that you're talking about? No, that's part of the contract as well. That's part of the contract as well. But how much does the curbing amount to in terms of the contract dollars and cents? Very little. All right. So the $60,000, give or take a few pennies, is what should be for the actual development of the site? To be honest with you, as we stand here today, I don't know how it breaks down invoice-wise, whether those were late invoices that had maybe to do with the curbing or something else. I just don't know. Okay. There's no problem that's been alleged with the curbing? No, just these two or three building sites. Moving on, then, Your Honor, to the reconsideration issue. And I think that plaintiff's – I'm sorry – Pasquino's counsel is sort of taking advantage of the fact that the courts have a real hard time determining whether it's something as reconsideration of motion to vacate and they're all sort of being meshed together. But I think he cites two cases primarily, Kirk v. Michael Reese and the Gatlin case as well. And I just want to draw distinctions to those primarily. The Kirk case is inapplicable here and completely distinguishable. In the Kirk case, motion for summary judgments for the defendants were granted on the grounds that there was no expert affidavit by the plaintiff. Ultimately then, because of that fact, no expert, motions granted. So within 30 days, there's a new attorney, a new affidavit, and equitable considerations. In that case, I want to say it was an ML case and it was a deceased young person. Equity – and the Wolins Court later certainly pointed out that the court in Kirk was really trying to save the plaintiff from her inept attorney. And I think that was where equity lied in that case. Gatlin v. Reuter was really a motion to reconsider. There was – it was literally new evidence. There was – summary judgment was granted based on affidavits of doctors, another Bednow case. Later, they take the deposition of a new doctor and a medical professor, and he says something that raises a question of fact that precluded summary judgment time before. So this was literally new evidence. I'm saying this is not new evidence. And what was different between this case and Kirk is that they retained their expert before summary judgment, past quinoa meaning, not afterwards. They knew they had an expert. They never decided to ask for a continuance. And the judge was very specific about that. Well, in determining when – what is new evidence, do you look at when the expert was retained or what the basis is of the expert's affidavit or testimony? Well, I think that when you're talking about new evidence, it's – the new evidence typically is something that came out, something that was not disclosed or not available prior to the date of the hearing. And it actually – if you look at the standard for summary judgment and for reconsideration, according to the – the Redlman v. Clare's Priory case, it's newly discovered evidence not available at the time of the hearing. So all the evidence in this case that's relied upon by the new expert was available at the time of the hearing. He was available at the time of the hearing. He never says in his affidavit, you know what, I wasn't available. He just said I didn't have time to look at everything yet. And that's their fault. This case, I think, is much more akin to the Delgado case, which is a Supreme Court case. And in that case – and this is where I'll close – the Supreme Court of Illinois said that under the equitable theory for vacating an award of summary judgment, the Supreme Court held that new matter may not be submitted by the trial court without good reason shown. And without a good reason, the court has no discretion to submit that new matter. In this case, passable evidence really showed no reason why they didn't get an expert earlier, why they didn't come in on a motion to continue, the judge said she would have granted it. And they really provided no reason whatsoever other than, well, we didn't think we needed one because there was a – there was no 213 order. And we know that – and this court has well held in the Rainer case that in the face of a summary judgment, the party opposing it has to come forward with all their evidence. Can't wait, can't hold some back. The Supreme Court of Illinois has stated that you can't lose a motion for summary judgment and try and gather up evidence then to reconsider. So just to wrap up, you're basically saying that good cause would have to be shown first before you get into the issue of infusive discretion. Absolutely. And I think there was no abuse of discretion here, especially thinking of the standard that they cite to it. Thank you very much, counsel. Thank you, Your Honor. Mr. Pollard. Thank you, Your Honor. I'd like to establish three things in Rapallo. First, it is going to be necessary for me to go through the evidence that was presented to the judge on summary judgment, which I didn't get to the first time. There is an affidavit from Anthony Pasquinelli at paragraph 21 of that affidavit. He says the compaction of the land based on his personal inspection at Central Park did not meet the contractual requirement of 95 percent. That was before the judge on summary judgment. That in and of itself was enough to survive. The summary report from TSC when they did the 2003 testing showing less than 95 percent compaction after the fact, that was before the court to show that that's there. Pasquinelli's inspection occurred after they left. So you've got Pasquinelli's inspection leading to the fact that there's no 95 percent compaction. He, by the way, has a master's degree in civil engineering from the University of Illinois. What about the 2002 sample? We don't say they say anything other than what they say, which is 95 percent compaction. But the judge knew about those. The judge knew about those, and the judge also knew but didn't accord any significance to the 2003, which showed that they were wrong. TSO's COO, Mr. Morris, testified. This is brought up to the court. My work subsequently shows unacceptable settlement had occurred. So, again, it's after the fact. So the court excluded all this. Your Honor, also Michael Sullivan, the fellow who actually did the compacting for Bell-Land, says, I don't always stay at the site to observe the testing. If I just saw everything move, I just kept going. I just kept compacting. Okay, that's evidence that was there. Is there anything in the contract that says somebody from Bell-Land has to stay there? No, but we talk about the two independent covenants. I think most homeowners in the state of Illinois would be shocked if this court ruled that to do good and workmanlike work doesn't mean that when you build a house it works. And yet when Bell left the site, Pat Spinelli was satisfied with the testing, that the compaction rate was proper, correct? Right. Okay, so let's, you raised race obsolete, counselor raised race obsolete. Let's go, let's, that is a pertinent analogy here, and it's pertinent in the contractual sense. Let's go to the classic law school case. Surgeon leaves a sponge in a patient during surgery. The nurse does the sponge count. Okay? Does the doctor get off because he gets summary judgment, not even acquitted, and after surgery he gets summary judgment in his favor because the nurse count was accurate before he closed up the work? I don't think so. But that's a negligence. I agree. How does that apply to a contractual relationship between the parties specified in the writing? Because the independent covenant of good and workmanlike work was not met here. After the house sank, after the patient got sick, the person who did the sponge count went back and counted the sponges, and you know what? They said they were wrong. There's one left in the picture. That's what this case is. The independent covenant of good and workmanlike manner survives. Those other things, about 95% compaction, are additional agreements. Well, how long does it survive? You're asking us to decide how long. It was good in 2001. It survived to 2002. And that's what – And now. And after the court accepted counsel's argument and summary judgment, we got the expert. Our expert on the motion to reconsider in paragraph 21 of his affidavit. This is new evidence. To a reasonable degree of engineering certainty, and in my experience in the industry, nothing should occur to reduce or modify a proper 95% compaction, even if there is a delay between compaction and building. That's on the motion to reconsider. It debunks the whole argument. And so I think this is a case that cries out the word questions present on the basis of past penalties, affidavit alone. And the last point I would make is on the chronology. There were two motions for summary judgment. Bell landed as plaintiff filed its on August 29th. So before you could respond, we got both of them in. And there was nothing in any discovery order about expert witnesses. So I would ask the court to reverse on summary judgment. If not, then reverse on the motion to reconsider. But this is a case where justice hasn't been done. I think an arbitrary line was improperly drawn by the trial court. I think questions of fact exist here, and I would ask the court to reverse no matter. Thank you very much. Thank you. Thank you, counsel. At this time, the court will take the matter under advisement and render a decision in due course. Court stands.